**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**CASE NO.: 1:25-cv-20550-PCH**

DRIVEN, P.S.C., as the Liquidation Receiver for
NODUS INTERNATIONAL BANK, INC.,

      Plaintiff,

v.

TOMAS NIEMBRO CONCHA;
MORELLA RINCON DE NIEMBRO;
JUAN FRANCISCO RAMIREZ;
MARIA GABRIELA VASQUEZ DE RAMIREZ;
NODUS FINANCE, LLC;
OCEANA KEY BISCAYNE CORPORATION;
and JOSE G. SUAREZ;

      Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff, Driven, P.S.C., as the duly-appointed Receiver for the liquidation of Nodus International Bank, Inc., sues Defendants Tomas Niembro Concha, Morella Rincon de Niembro, Juan Francisco Ramirez, Maria Gabriela Vasquez de Ramirez, Oceana Key Biscayne Corporation, Nodus Finance, LLC, and Jose G. Suarez, and alleges:

## INTRODUCTION

1.    This is a case against Tomas Niembro Concha ("Niembro"), Juan Francisco Ramirez ("Ramirez"), and Jose G. Suarez ("Suarez"), former officers and directors of Nodus International Bank, Inc. ("Nodus Bank"), as well as their co-conspirators and related companies, based on breaches of fiduciary duty, constructive fraud, and other wrongful conduct.

2.    Nodus Bank is a Puerto Rico-based International Banking Entity ("IBE") organized under a license issued pursuant to Section 7 of the International Banking Center Regulatory Act, Act No. 52, dated August 11, 1989.

3.    Nodus Bank was jointly owned by Niembro and Ramirez. From their office in Miami, they treated Nodus Bank's funds as their own personal piggy bank by engaging in a series of self-dealing transactions to enrich themselves at the expense of Nodus Bank. In total, Niembro and Ramirez's various schemes have caused Nodus Bank to lose approximately $92 million.

4.    The subject of this Complaint concerns approximately $28.4 million of those losses, based on two conspiracies that Niembro and Ramirez planned and coordinated from Miami, Florida. Those schemes will be referred to as the "Our Microlending Scheme" and the "Nodus Finance Scheme."

5.    The Our Microlending Scheme worked like this:

a.    Niembro and Ramirez wanted to use Nodus Bank funds to grant themselves millions of dollars in personal loans.

b.    But lending restrictions imposed on IBEs like Nodus Bank prohibit that sort of insider transaction absent review and authorization from regulators in Puerto Rico.

c.    So, to avoid regulatory scrutiny, Niembro and Ramirez decided to funnel cash to themselves through a third-party.

d.    The conspiracy coalesced when Our Microlending, LLC, a Miami-based company, agreed to accept millions of dollars in cash from Nodus Bank and then, after taking a "fee" for itself, lend the money back to Niembro, Ramirez, and their families.

e.    Niembro and Ramirez accomplished the first part of the scheme by causing Nodus Bank to purchase $7 million in time deposits – called "Investment Certificates" – from Our Microlending.

f.    Our Microlending then used the funds used to purchase the Investment Certificates – minus its fee – to grant personal loans to Niembro, Ramirez, and their wives while Niembro and Ramirez pledged the Investment Certificates as "collateral."

g.    The Niembro and Ramirez families thus used Nodus Bank money—laundered through Our Microlending—for their own personal benefit.

h.    But then the Niembro and Ramirez families failed to repay their debts to Our Microlending when they became due.

i.    Our Microlending then passed the losses associated with the Niembro and Ramirez defaults along to Nodus Bank.

j.    As a result, the Our Microlending scheme has caused a net loss of approximately $2.6 million to Nodus Bank, excluding interest.

6.    The Nodus Finance Scheme worked as follows:

a.    Nodus Finance, LLC ("Nodus Finance") is a Miami-based company whose ultimate beneficial owners are Niembro and Ramirez. Suarez is its General Manager while also a director of Nodus Bank.

b.    Nodus Finance, as the name implies, extends loans in U.S. dollars to borrowers based both within and without the United States.

c.    Niembro and Ramirez caused Nodus Finance to originate approximately 47 such loans between September 2019 and September 2021. The total amount

3

of principal extended to those loans was approximately $25.7 million (together, the "47 Promissory Notes").

    d.    Critically, Niembro and Ramirez caused Nodus Bank to lend Nodus Finance the $25.7 million that Nodus Finance needed to fund the Promissory Notes. That resulted in Nodus Finance becoming indebted to Nodus Bank for an equivalent amount (excluding interest).

    e.    Then, at a time when they knew that Nodus Bank was being placed in liquidation, but before the liquidation plan could be carried out, Ramirez and Niembro, together with Suarez, sought to eliminate Nodus Finance's debt to Nodus Bank by causing Nodus Bank to "purchase" that very same portfolio of loans for approximately $26 million.

    f.    That transaction was reduced to writing in a purchase agreement that was signed by Suarez on behalf of Nodus Finance and on behalf of Nodus Bank by Niembro. In the written agreement Nodus Finance represented, among other things, that that all of the loans were fully collateralized and insured. But those and other representations were false.

    g.    As "consideration" for this bogus purchase, Niembro, Ramirez, and Suarez caused Nodus Bank to credit Nodus Finance the $26 million purchase price, which not only wiped out the debt owed by Nodus Finance but magically turned Nodus Finance into a creditor of Nodus Bank.

7.    Nodus Bank's primary regulator, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico (the "OCIF") eventually began to express concerns about Niembro and Ramirez, which led to the OCIF invoking its powers arising under

4

7 L.P.R.A. § 232a to: i) remove Niembro and Ramirez from Nodus Bank, ii) appoint Driven as Receiver, and iii) order the liquidation of Nodus Bank.

8.     Under the powers granted to it by the OCIF, Driven now brings this action to obtain remedies for the harm caused to Nodus Bank.

## PARTIES AND RELEVANT NON-PARTIES

### A.     PLAINTIFF

9.     Plaintiff, Driven, is a Puerto Rico Professional Services Corporation comprised of more than 170 professionals, including, but not limited to Certified Public Accountants, Certified Valuation Analysts, Certified Fraud Examiners, and attorneys. It is headquartered in Puerto Rico and is a Puerto Rico citizen for purposes of diversity jurisdiction. The OCIF appointed Driven as the liquidation Receiver for Nodus Bank on or about October 3, 2023.

10.     Nodus Bank is a Puerto Rico IBE with its headquarters in San Juan, Puerto Rico and, to the extent applicable, is a Puerto Rico citizen for purposes of diversity jurisdiction. It was, at all times relevant hereto, owned by Niembro and Ramirez before being placed into receivership and having its license revoked by the OCIF.

### B.     DEFENDANTS

11.     Defendant Tomas Niembro owned 60% of Nodus Bank and served as its CEO and as a Director at all times relevant hereto. Niembro is a citizen of the State of Florida for purposes of diversity jurisdiction, with his principal residence at Ocean Tower Two, 791 Crandon Blvd., Apt 1408, Key Biscayne, Florida 33149.

12.     Defendant Morella Rincon de Niembro ("Morella" or "Ms. Niembro") is Niembro's wife. She is a citizen of the State of Florida for purposes of diversity jurisdiction, with

her principal residence at Ocean Tower Two, 791 Crandon Blvd., Apt. 1408, Key Biscayne, Florida 33149.

13.     Defendant Juan Ramirez owned 40% of Nodus Bank and served as the Chairman of its Board of Directors at all times relevant hereto. Ramirez is a citizen of Florida for purposes of diversity jurisdiction. His last known residence is 3525 Royal Palm Ave., Miami, Florida 33133.

14.     Defendant Maria Gabriela Vasquez de Ramirez ("Maria" or "Ms. Ramirez") is Ramirez's spouse. She conspired with her husband to siphon funds from Nodus Bank for their personal use. Ms. Ramirez is a citizen of Florida for purposes of diversity jurisdiction. Her last known residence is 3525 Royal Palm Avenue, Miami, Florida 33133.

15.     Defendant Nodus Finance, LLC is a Florida limited liability company with its principal business address at 1200 Brickell Ave., Suite 425, Miami, Florida 33131. Nodus Finance's sole member is Nodus Financial Holding, Inc. ("Nodus Holding"), a Florida corporation with its principal place of business at that same address in Miami-Dade County, Florida. Nodus Finance is therefore a citizen of the State of Florida for purposes of diversity jurisdiction.

16.     Defendant Jose G. Suarez was, at all times relevant hereto, the General Manager of Nodus Finance as well as a Director of Nodus Bank. He is a citizen of the State of Florida for purposes of diversity jurisdiction. He resides at 7761 NW 114th Place, Doral, Florida 33178.

17.     Defendant Oceana Key Biscayne Corporation ("Oceana") is a currently-dissolved Florida for profit corporation with its principal address at 1000 Brickell Ave., Suite 112, Miami, Florida 33131, and is thus a citizen of the State of Florida for purposes of diversity jurisdiction. Oceana was, at all times relevant hereto, owned by Tomas and Morella Niembro, and was used as a conduit for certain ill-gotten funds, as further alleged herein.

C.      NON-PARTY CO-CONSPIRATOR

18.     Our Microlending was the intermediary that, for a fee, agreed to launder funds from Nodus Bank into personal loans for Niembro, Ramirez, and their families. It is a Florida Limited Liability Company headquartered in Miami, Florida.

## JURISDICTION AND VENUE

19.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees, and because the Parties are completely diverse.

20.     The Court has personal jurisdiction over Tomas and Morella Niembro as they reside in Florida and have been duly served with process in Florida. In the alternative, the Court has personal jurisdiction over Tomas and Morella Niembro pursuant to § 48.193, Florida Statutes, because, at all times relevant and as further alleged herein, they: (1) operated, conducted, engaged in, or carried out business in this state or have an office or agency in this State; (2) committed tortious acts within this State or conspired with others to commit tortious acts in this State; (3) beneficially owned, used, or possessed real property in this State; and (4) engaged in substantial and not isolated activity in this State

21.     The Court has personal jurisdiction over Juan and Maria Ramirez as they reside in Florida and have been duly served with process in Florida. In the alternative, the Court has personal jurisdiction over Juan and Maria Ramirez pursuant to § 48.193, Florida Statutes, because, at all times relevant and as further alleged herein, they: (1) operated, conducted, engaged in, or carried out business in this state or have an office or agency in this State; (2) committed tortious acts within this State or conspired with others to commit tortious acts in this State; (3) beneficially

owned, used, or possessed real property in this State; and (4) engaged in substantial and not isolated activity in this State.

22.     The Court has personal jurisdiction over Nodus Finance, LLC and Oceana because both are Florida business entities with their principal places of business in Florida and both have been duly served with process in Florida.

23.     The Court has personal jurisdiction over Jose G. Suarez as he resides in Florida and has been duly served with process in Florida.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Miami-Dade County was the locus of the actions alleged herein, where the causes of action accrued. Most Defendants reside or have their principal places of business in Miami-Dade County as well.

## GENERAL ALLEGATIONS

25.     Nodus Bank was founded under a license issued in 2009 to operate as a Puerto Rico IBE, and commenced operations in 2010. Nodus Bank was formed by Optivalores Investment Company, Ltd, which owned 100% of its shares.

26.     The OCIF conducted a series of examinations of Nodus Bank, beginning on February 15, 2012. At that time, the OCIF found that Nodus Bank's financial condition was less than satisfactory. Its financial condition then continued to deteriorate over the course of subsequent examinations. Over the years, the OCIF also found violations of Bank Secrecy Act and Anti-Money Laundering regulations and issued a series of regulatory directives to Nodus Bank and its Board of Directors to correct these deficiencies, but to no avail.

27.      On May 2, 2017, the OCIF authorized a change of control whereby ownership of Nodus Bank was transferred to two corporations, one of which was controlled by Niembro, and the other by Ramirez.

28.     The OCIF conducted a fourth examination of Nodus Bank on October 16, 2017, finding serious financial and managerial deficiencies. The OCIF urged the Nodus Bank's Board of Directors, which was now under the administration of Niembro and Ramirez, to address those deficiencies.

29.     Niembro was appointed as President of Nodus Bank on June 1, 2018. On August 5, 2019, the OCIF ratified the appointment of Niembro as President and Ramirez as Chairman of the Board.

30.     On November 12, 2019, the OCIF authorized the transfer of Nodus Bank shares from Niembro and Ramirez's corporations to Niembro and Ramirez in their individual capacities. As a result, Nodus Bank changed from an IBE whose shareholders and owners were legal entities, to one owned directly by Niembro and Ramirez.

31.     As officers and directors of Nodus Bank, Niembro and Ramirez owed a fiduciary duty of loyalty to Nodus Bank.

32.     At all times relevant hereto, Niembro and Ramirez controlled Nodus Bank from the offices of Nodus Finance, in Miami, Florida.

33.     On January 18, 2022, the fifth and final examination of Nodus Bank by the OCIF resulted in the lowest and most critical rating possible for an IBE. The OCIF then issued further regulatory directives to Nodus Bank, but Nodus Bank did not comply.

34.     Throughout 2022, the OCIF received several claims from depositors related to Nodus Bank's refusal to complete fund transfers requested in amounts totaling millions of dollars. After an investigation, the OCIF determined that Nodus Bank had to be liquidated and presented it, in March 2023, with several alternatives for carrying out that process.

35.     In May 2023, the OCIF, Nodus Bank, and Niembro and Ramirez signed a Plan of Voluntary Liquidation and Dissolution, which was amended on August 3, 2023. The Plan required Nodus Bank to limit its business activities to winding up its business and affairs, marshalling and preserving the value of its assets, and distributing assets in accordance with the Plan's provisions. The Plan also prohibited the distribution of Nodus Bank's assets to Shareholders until all obligations were fulfilled.

36.     Plaintiff, Driven, was designated as Administrator of the Liquidation Plan on June 5, 2023. Driven proceeded to investigate the maze of transactions undertaken by Nodus Bank while it was under the direction of Niembro and Ramirez, and discovered losses totaling tens of millions of dollars.

37.     Alarmed by Bank's state of affairs, on October 3, 2023 the OCIF issued a Complaint and Provision and Permanent Order for the Appointment of a Receiver and Revocation of License against Nodus Bank (the "Receivership Order"). *See* [ECF No. 58-1]. Through that Order, the OCIF appointed Driven as an independent Receiver, replaced Nodus Bank's management and Board of Directors with Driven, and authorized Driven to take possession and control of all the assets and liabilities of Nodus Bank to complete the liquidation process.

38.     By resolution dated October 16, 2023, the OCIF then revoked Nodus Bank's license, confirmed the Receivership Order appointing Driven as Receiver, and made the appointment permanent until liquidation is complete.

39.     Niembro and Ramirez accepted the appointment of Driven as Receiver.

40.     To date, Driven has ascertained that Nodus Bank owes its depositors approximately $92 million, and that more than ninety-five percent of Nodus Bank's loan portfolio is not only uncollateralized, but also largely uncollectable.

A.      THE OUR MICROLENDING SCHEME

41.     Niembro and Ramirez conspired with co-Defendants and with non-party Our Microlending LLC, a Florida limited liability company, to defraud Nodus Bank for their personal benefit, while avoiding the OCIF's restrictions on related-party loans.

42.     Our Microlending is a microfinance company involved in the business of lending small amounts to start-ups, small businesses and entrepreneurs in Miami-Dade, Broward, and Palm Beach Counties. The average loan from Our Microlending is only around $14,000.

43.     To fund its operations, Our Microlending raises capital in several ways, one of which is the issuance of Investment Certificates. An Investment Certificate is similar to a certificate of deposit (i.e., a "CD" or "time deposit"), with certain terms and conditions for the return of the investor's funds after a period of time, with interest.

44.     Although an Investment Certificate might be a legitimate method for raising capital, Niembro and Ramirez used the instrument to defraud Nodus Bank for their own personal benefit.

45.     Specifically, on or about March 18, 2022, Niembro and Ramirez met with a representative of Our Microlending in Miami, Florida, and all three agreed to launder $7 million from Nodus Bank through Our Microlending and back to the Niembro and Ramirez families.

46.     On April 11, 2022, Niembro and Ramirez, acting as directors of Nodus Bank and with authorization from other members of the Board of Directors for the Bank, approved the acquisition  of $7 million in Our Microlending Investment Certificates with a 1-year term and an annual interest rate of 5.05%.

47.     That that same day, April 11, 2022, Nodus Bank then wired $7 million to Our Microlending in exchange for the Investment Certificates.

48.     In exchange, also on April 11, 2022, Our Microlending issued two Investment Certificates to Nodus Bank: Investment Certificate No. 4C1222040001-0, for $4 million; and Investment Certificate No. 4C1222040002-0, for $3 million. *See* Investment Certificates, attached as Composite Exhibit "A."[1]

49.     Niembro and Ramirez caused Nodus Bank to book the Investment Certificates as assets of Nodus Bank.

50.     On April 12, 2022, the day after Our Microlending received $4 million in exchange for Investment Certificate No. 4C1222040001-0, Tomas and Morella Niembro "borrowed" approximately $3.7 million from Our Microlending. *See* Niembro Promissory Note dated April 12, 2022, attached hereto as Exhibit "B."

51.     Our Microlending kept the $0.3 million difference as its "fee".

52.     To secure the personal loan from Our Microlending to the Niembro family, Niembro, as CEO of Nodus Bank, also granted Our Microlending a first priority security interest in the $4 million of Nodus Bank depositor funds that were transferred to Our Microlending in exchange for Investment Certificate No. 4C1222040001-0. *See* Niembro Pledge, attached as Exhibit "D."

53.     Notably, Tomas and Morella Niembro signed the $3.7 million promissory note with Our Microlending in their individual capacities, as well as on behalf of their company, Defendant Oceana Key Biscayne Corp.

---

[1]     Our Microlending issued additional Investment Certificates to Nodus Bank in 2023 and 2024. Driven is still investigating whether those Investment Certificates related to additional funds transfers or were used to paper the fraud being perpetrated by Niembro and Ramirez in relation to the original transfer of $7 million.

54.     Pursuant to the Niembros' instructions, Our Microlending sent the $3.7 million to a Citibank account held by Oceana. *See* Oceana Wire Instructions, attached as Exhibit "C."

55.     At the time that she signed the promissory note, Morella Niembro knew or had reason to know that her husband, Tomas Niembro, owed a fiduciary duty of loyalty to Nodus Bank, that the cash used to fund this loan came from Nodus Bank, and that she and her husband, Tomas Niembro, had no right to use those Nodus Bank funds for their own benefit. Nevertheless, she conspired with her husband to breach his fiduciary duty of loyalty to Nodus Bank by executing the promissory note and receiving the funds via their company, Oceana.

56.     On April 12, 2022, the day after Our Microlending received $3 million in exchange for Investment Certificate No. 4C1222040002-0, Juan and Maria Ramirez, "borrowed" approximately $2.7 million from Our Microlending. *See* Ramirez Promissory Note dated April 12, 2022, attached hereto as Exhibit "E."

57.      Our Microlending kept the $0.3 million difference as its "fee".

58.     To secure the personal loan from Our Microlending to the Ramirez family, Ramirez, as Chairman of Nodus Bank, granted Our Microlending a first priority security interest in the $3 million of Nodus Bank depositor funds that were transferred to Our Microlending in exchange for Investment Certificate No. 4C1222040002-0. *See* Ramirez Pledge, attached as Exhibit "G."

59.     Pursuant to the Ramirez's instructions, Our Microlending sent those funds to their personal account in Miami. *See* Ramirez Wire Instructions, attached hereto as Exhibit "F."

60.     At the time that she signed the promissory note, Maria Ramirez knew or had reason to know that her husband, Juan Ramirez, owed a fiduciary duty of loyalty to Nodus Bank, that the cash used to fund of this loan came from Nodus Bank, and that she and her husband, Juan Ramirez, had no right to use those Nodus Bank funds for their own benefit. Nevertheless, she conspired with

her husband to breach his fiduciary duty of loyalty to Nodus Bank by executing the promissory note and receiving the funds in their personal account.

61.      While the personal "loans" to the Niembro and Ramirez families were partially repaid, $0.3 million remains unpaid on the Niembro loan, and $2.3 million remains unpaid on the Ramirez's loan. *See* Account Statements, attached hereto as Composite Exhibit "H".

62.      As a consequence, Our Microlending has not been able to return the cash Nodus Bank is entitled to through a redemption of the Investment Certificates. And although Our Microlending has agreed not to execute upon the Nodus Bank funds pledged as collateral, Nodus Bank has nonetheless lost in excess of $2.6 million due to the Our Microlending Scheme.

### B.    THE NODUS FINANCE SCHEME

63.      Between September 19, 2019 and September 29, 2021, without the authorization of OCIF and without conducting a repayment analysis, Niembro, Ramirez, and Suarez caused Nodus Finance to initiate loans in the form of approximately 47 Promissory Notes, for a total principal value of approximately $25.7 million.

64.      Niembro, Ramirez, and Suarez caused Nodus Bank to fund each of those loans as they were made. Nodus Finance was supposed to collect and then remit to Nodus Bank principal and interest on those Notes, while retaining for itself the right to receive fees for "servicing" the loans.

65.      As a result of these transactions, Nodus Finance became a debtor to Nodus Bank in the amount of approximately $25.7 million, exclusive of interest. But the loans were non-performing.

66.      On April 28, 2023, without prior authorization from OCIF and knowing that the liquidation process was imminent, Niembro, Ramirez, and Suarez arrived at a scheme to saddle

14

Nodus Bank with Nodus Finance's $25.7 million debt by "selling" the loan portfolio to Nodus Bank.

67.     Toward that end, Niembro, Ramirez, and Suarez caused Nodus Bank to enter into what was called a "Mortgage Loan Purchase and Servicing Agreement" (the "Loan Purchase Agreement") with Nodus Finance, by which Nodus Bank "purchased" the very same portfolio of non-performing loans from Nodus Finance, for a contract price of approximately $26 million. *See* Loan Purchase Agreement, attached as Exhibit "I."

68.     The Loan Purchase Agreement contained a number of representations and warranties that turned out to be false. For example, the Loan Purchase Agreement represented that each Mortgage Loan:

    a.   "contains a written appraisal". . . . Ex. I, Section 1.3(a);

    b.   contained "documented income, employment, and/or assets" of the borrowers, Ex. I, Section 1.3(b);

    c.   "has the benefit of a valid, binding and enforceable primary mortgage insurance policy issued by a qualified insurer." Ex. I, Section 1.3(e).

69.     The Loan Purchase Agreement further represented that:

    a.   "The Mortgage is a valid, subsisting and enforceable first lien on the property therein described[.]" Ex. I, Section 1.3(h); and, without limitation,

    b.   "All payments required to be made up to the due dates of the Mortgage Loans immediately preceding the Closing Date . . . have been made[.]" Ex. I, Section 1.3(j);

70.     These and other representations were false. Yet, Suarez executed the Loan Purchase Agreement as General Manager of Nodus Finance while he was also a director of Nodus Bank.

Niembro executed the Loan Purchase Agreement as President of Nodus Bank while he was a beneficial owner of Nodus Finance in addition to being a Director of Nodus Bank.

71.     As consideration for the "purchase," Although the Loan Purchase Agreement stated that Nodus Bank would pay approximately $26 million to Nodus Finance, Nodus Bank's financial statements reflect that it accepted Nodus Finance's loan portfolio as payment of the latter's $25.7 million debt to Nodus Bank.

72.     By carrying out this transaction during discussions leading up to the implementation of the Liquidation Plan, Niembro, Ramirez, and Suarez caused Nodus Bank's promissory notes assets to decrease by approximately $25.7 million. This freed Nodus Finance and its owners from a liquid debt to Nodus Bank while simultaneously increasing Nodus Finance's deposit account at Nodus Bank by approximately $273,000.00, all to the detriment of Nodus Bank. *See* Transaction Balance Sheet, attached hereto as Exhibit "J".

**COUNT I**
**Breach of the Fiduciary Duty of Loyalty in Relation to the Our Microlending Scheme**
**(Tomas Niembro Concha and Juan Francisco Ramirez)**

Plaintiff realleges paragraphs 1 through 62 as if fully incorporated herein, and further alleges:

73.     Defendants Tomas Niembro and Juan Ramirez owed, as officers and directors of Nodus Bank, a fiduciary duty of loyalty to Nodus Bank.

74.     With respect to the Our Microlending Scheme, Niembro and Ramirez breached their fiduciary duty of loyalty to Nodus Bank by:

      a.     engaging in self-dealing and conflict of interest transactions;

      b.     prioritizing their personal interests over those of Nodus Bank, to the detriment of Nodus Bank;

    c.       granting themselves loans and concealing those loans via Investment Certificates from Our Microlending;

    d.       pledging the Nodus Bank's funds as collateral for personal loans to themselves from Our Microlending; and, without limitation,

    e.       failing to repay funds that belonged to Nodus Bank.

75.    As a result, Nodus Bank has been injured.

Wherefore Plaintiff, Driven, demands judgment jointly and severally against Defendants Tomas Niembro Concha and Juan Francisco Ramirez for an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, as well as prejudgment interest and costs, and such further relief as the Court deems just and equitable.

## COUNT II
### Constructive Fraud in Relation to the Our Microlending Scheme
### (Against Tomas Niembro Concha and Juan Francisco Ramirez)

Plaintiff realleges paragraphs 1 through 62 and 73 through 75 as if fully incorporated herein, and further alleges:

76.    As fiduciaries of Nodus Bank, Niembro and Ramirez were in a relationship of trust or confidence to Nodus Bank.

77.    Niembro and Ramirez abused their position of trust and confidence by engaging in self-dealing, fraud, and conflict of interest transactions, prioritizing their personal interests over those of Nodus Bank to the detriment of Nodus Bank, by granting themselves loans and concealing those loans via Investment Certificates from Our Microlending.

78.    As a result, Nodus Bank has been injured.

Wherefore Plaintiff, Driven, demands judgment jointly and severally against Defendants Tomas Niembro Concha and Juan Francisco Ramirez for an amount to be determined at trial,

including but not limited to compensatory damages, prejudgment interest and costs, and such further relief as the Court deems just and equitable.

## COUNT III
### Conspiracy to Breach Fiduciary Duty in Relation to the Our Microlending Scheme
### (Against Defendants Tomas Niembro Concha, Morella Rincon de Niembro, Juan Francisco Ramirez, and Maria Gabriela Vasquez de Ramirez)

Plaintiff realleges paragraphs 1 through 62 and 73 through 75 as if fully incorporated herein, and further alleges:

79.    Defendants Tomas and Morella Niembro and Juan and Maria Ramirez knew or had reason to know of the fiduciary duty of loyalty owed by Tomas Niembro and Juan Ramirez to Nodus Bank.

80.    Tomas and Morella Niembro and Juan and Maria Ramirez entered into an agreement, among themselves and with non-party Our Microlending, to breach, or to assist in breaching, the fiduciary duty of loyalty owed to Nodus Bank by Tomas Niembro and Juan Ramirez.

81.    Tomas Niembro undertook one or more of the following acts in furtherance of the conspiracy:

    a.    orchestrated and advanced the scheme, through communications with Juan Ramirez, Our Microlending, and persons at Nodus Bank;

    b.    arranged for purchase of the Investment Certificates to be approved by Nodus Bank's Board of Directors so that the transaction would escape scrutiny by regulators;

    c.    authorized the transfer of funds from Nodus Bank to Our Microlending;

    d.    pledged the cash transferred by Nodus Bank to Our Microlending under Investment Certificate No. 4C1222040001-0 as collateral for a loan to

himself and his wife while, at the same time, causing that Investment Certificate to be booked as an asset of Nodus Bank;

e.   executed the Niembro Promissory Note, on his own behalf and on behalf of Oceana Key Biscayne Corp.;

f.   secured the agreement of his wife, Morella Niembro, to execute the Niembro Promissory Note; and, without limitation,

g.   accepted funds from Our Microlending that he knew belonged to Nodus Bank.

82.   Juan Ramirez undertook one or more of the following acts in furtherance of the conspiracy:

a.   orchestrated and advanced the scheme, through communications with Tomas Niembro, Our Microlending, and persons at Nodus Bank;

b.   arranged for purchase of the Investment Certificates to be approved by Nodus Bank's Board of Directors so that the transaction would escape scrutiny by regulators;

c.   authorized the transfer of funds from Nodus Bank to Our Microlending;

d.   pledged the cash transferred by Nodus Bank to Our Microlending under Investment Certificate No. 4C1222040002-0 (which belonged to Nodus Bank) as collateral for a loan to himself and his wife while, at the same time, causing that Investment Certificate to be booked as an asset of Nodus Bank;

e.   executed the Ramirez Promissory Note;

f.   secured the agreement of his wife, Maria Ramirez, to execute the Ramirez Promissory Note; and, without limitation,

g.      accepted funds from Our Microlending that he knew belonged to Nodus
Bank.

83.      Morella Niembro, while knowing or having reason to know that the proceeds of a
loan from Our Microlending belonged to Nodus Bank and that her husband was engaged in self-
dealing, furthered the conspiracy by:

a.      executing the Niembro Promissory note, on her own behalf and on behalf
of Oceana Key Biscayne Corp.; and, without limitation,

b.      accepting the delivery of funds from Our Microlending.

84.      Maria Ramirez, while knowing or having reason to know that the proceeds of a
loan from Our Microlending belonged to Nodus Bank and that her husband was engaged in self-
dealing, furthered the conspiracy by:

a.      executing the Ramirez Promissory Note; and, without limitation,

b.      accepting the delivery of funds from Our Microlending.

85.      As a result of the conspiracy, Nodus Bank has been injured.

Wherefore Plaintiff, Driven, demands judgment jointly and severally against Defendants
Tomas and Morella Niembro and Juan and Maria Ramirez for an amount to be determined at trial,
including but not limited to compensatory damages, punitive damages, as well as prejudgment
interest and costs, and such further relief as the Court deems just and equitable.

**COUNT IV**
**Breach of Fiduciary Duty of Loyalty in Relation to the Nodus Finance Scheme**
**(Against Tomas Niembro Concha, Juan Francisco Ramirez, and Jose G. Suarez)**

Plaintiff realleges paragraphs 1 through 40 and 63 through 72 as if fully incorporated
herein, and further alleges:

86.     Tomas Niembro, Juan Ramirez, and Jose G. Suarez owed, as officers and directors of Nodus Bank, a fiduciary duty of loyalty to Nodus Bank.

87.     Niembro, Ramirez, and Suarez breached their fiduciary duties of loyalty in relation to the Nodus Finance Scheme by:

      a.     engaging in self-dealing and conflict of interest transactions;

      b.     prioritizing their personal interests over those of Nodus Bank, to the latter's detriment;

      c.     fraudulently causing Nodus Finance to sell, and for Nodus Bank to purchase, a portfolio of worthless loans in the amount of approximately $26 million in order to enrich themselves; and, without limitation,

      d.     concealing their self-dealing and fraud from regulatory authorities.

88.     As a result, Nodus Bank has been injured.

Wherefore Plaintiff, Driven, demands judgment jointly and severally against Defendants Tomas Niembro, Juan Ramirez, and Jose Suarez for an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, prejudgment interest and costs, and such further relief as the Court deems just and equitable.

**COUNT V**
**Constructive Fraud in Relation to the Nodus Finance Scheme**
**(Against Tomas Niembro, Juan Ramirez, and Jose Suarez)**

Plaintiff realleges paragraphs 1 through 40 and 63 through 72 as if fully alleged herein, and further alleges:

89.     As fiduciaries of Nodus Bank, Tomas Niembro, Juan Ramirez, Jose Suarez were in a relationship of trust or confidence to Nodus Bank.

90.     Niembro, Ramirez, and Suarez abused their position of trust and confidence in relation to the Nodus Finance Scheme by engaging in self-dealing, fraud, and conflict of interest transactions, prioritizing their personal interests over those of Nodus Bank, to its detriment, and by causing Nodus Bank to purchase a fraudulent loan portfolio from Nodus Finance, which caused a loss to Nodus Bank of approximately $25 million.

91.     As a result, Nodus Bank has been injured.

Wherefore Plaintiff, Driven, demands judgment jointly and severally against Defendants Tomas Niembro, Juan Ramirez, and Jose Suarez for an amount to be determined at trial, including but not limited to compensatory damages, prejudgment interest and costs, and such further relief as the Court deems just and equitable.

## COUNT VI
### Breach of Contract
### (Against Nodus Finance, LLC)

92.     Plaintiff realleges paragraphs 1 through 40 and 63 through 72 as if fully alleged herein, and further alleges:

93.     The Loan Purchase Agreement included material terms such as representations that the subject loans were backed by collateral, appraisals, and other documentation, and that they were fully insured and collectible.

94.     Nodus Finance breached the Loan Purchase Agreement by failing to deliver a book of mortgage loans that complied with the terms of the Agreement.

95.     As a consequence, Nodus Bank has been injured.

Wherefore Plaintiff, Driven, demands judgment against Nodus Finance, LLC for an amount to be determined at trial, as well as prejudgment interest and costs, attorneys fees and costs, and such further relief as the Court deems just and equitable.

**COUNT VII**
**Unjust Enrichment**
**(Against Nodus Finance, LLC)**

Plaintiff realleges paragraphs 1 through 40 and 63 through 72, as if fully incorporated herein, and further alleges:

96.     Nodus Bank conferred a benefit on Nodus Finance when it credited the debt owed by Nodus Finance under the 47 Promissory Notes as consideration for the Loan Purchase Agreement.

97.     Nodus Finance accepted the benefit.

98.     Circumstances are such that it would be unjust to allow Nodus Finance to retain the benefit.

Wherefore Plaintiff, Driven, demands judgment against Nodus Finance, LLC for an amount to be determined at trial, as well as prejudgment interest and costs, and such further relief as the Court deems just and equitable.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial for all matters so triable.

Dated:  August 18, 2025

Respectfully submitted,

**DIAZ, REUS & TARG, LLP**
100 Southeast Second Street, Suite 3400
Miami, Florida 33131
Telephone: (305) 375-9220
Facsimile: (305) 375-8050

By: */s/ Brant C. Hadaway*
Brant C. Hadaway, B.C.S. (Florida Bar No. 494690)
Email Address: bhadaway@diazreus.com
Marta Colomar Garcia (Florida Bar No. 40869)
Email Address: mcolomar@diazreus.com
Evan J. Stroman (Florida Bar No. 118929)
Email Address: estroman@diazreus.com

*Counsel for Plaintiff Driven, P.S.C. as the Liquidation Trustee for Nodus International Bank, Inc.*

24